**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
         jwilner@bursor.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALESSANDRO DE LA TORRE, individually and on behalf of all others similarly situated, <br><br>                    Plaintiff, <br>    v. <br> VSHRED, LLC, <br>                   Defendant. | Case No.    2:24-cv-4917 <br><br> **CLASS ACTION COMPLAINT** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Alessandro De La Torre ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Vshred, LLC ("Vshred" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Vshred for aiding, agreeing with, employing, procuring, or otherwise enabling the wiretapping of the electronic communications and video viewing information of visitors to its website, vshred.com (the "Website").

2. Specifically, Defendant aids, agrees with, procures, or otherwise enables at least six third-party service providers to collect information from visitors to its Website: Meta (formerly Facebook), TikTok Ltd. ("TikTok"), Snap, Inc. ("Snapchat"), Datadog, Inc. ("Datadog"), X (formerly Twitter) and Alphabet, Inc. ("Google") (collectively, the "Third Parties").

3. In particular, these Third Parties—as enabled by Defendant—eavesdrop on the information provided by Website visitors in the form fields of the introductory quiz website visitors are prompted to take upon first landing on the Website (the "Quiz"), including users' weight, age, height, activity levels, and body perception, and share the title of videos viewed by website visitors to the Third Parties, all without the prior consent of visitors to the Website. These Third Parties conduct the wiretapping through pieces of software-as-a-service ("SaaS"): the Facebook Pixel, provided by Meta, the TikTok Pixel, provided by TikTok, the Snap Pixel, provided by Snapchat, Datadog RUM and RUM Session Replay, provided by Datadog, the X Pixel, provided by X and the Google Analytics Pixel, provided by Google (the "Pixels").

---

CLASS ACTION COMPLAINT                                                              1

4.     The electronic communications made in response to the Quiz questions are routed through the servers of and are used by the Third Parties to, among other things, assist Defendant with its marketing, advertising, and data analytics efforts.

5.     The Third Parties also monetize the data provided by consumers for their own marketing purposes.

6.     The nature of the Third Parties' licensing agreements with Defendant are such that Defendant "aids, agrees with, employs, or conspires" to permit the Third Parties to read, attempt to read, to learn, and/or to use the confidential communications of Website visitors without prior consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631(a).

7.     Defendant also shares website visitors' video viewing information and personally identifying information with the Third Parties, thus violating the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

8.     Plaintiff brings this action on behalf of all visitors to the Website who watched a video on the Website and on behalf of all California residents who submitted responses to the Quiz questions on the Website while in California, and whose electronic communications were intercepted or recorded by the Third Parties.

## PARTIES

9.     Plaintiff Alessandro De La Torre is a California citizen who resides in Hacienda Heights, California.  Plaintiff was in California when he visited the Website and submitted answers to the Quiz.

10.    In April 2023, Plaintiff visited the Website and took the Body Type quiz displayed on the homepage for the purposes of obtaining a custom diet and exercise plan.  In order to receive a custom plan, Plaintiff was required to provide personal identifiers, including his gender, age, height, weight, activity level, and body perception.  Unbeknownst to Plaintiff, Defendant assisted the Third Parties with intercepting this personal information.

11.    When visiting the website, Plaintiff watched videos provided by Defendant about topics related to personal fitness.  Unbeknownst to Plaintiff, Defendant shared the titles of the videos watched by Plaintiff, as well as information sufficient to identify him, with the Third Parties.

12.    Defendant Vshred, LLC is a Nevada corporation whose principal place of business is at 4530 S Decatur Blvd Las Vegas, Nevada 89103.  Defendant owns and operates the Website.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

14.    This Court has personal jurisdiction over Defendant. First, by integrating the code that allowed a third party to wiretap communications, Defendant acted intentionally.  Second, Defendant knew that the harm would be felt in California because it received billing and mailing addresses each time a customer completed a purchase.  Third, Defendant expressly aimed its conduct at California because Defendant, in the regular course of business, sells products through its interactive website and causes those products to be delivered to the forum.  More specifically, through the Website, Defendant sells products to California residents and delivers those products to their home addresses in California.  Further, the servers of Google, Facebook, Snapchat, and X, where Plaintiff's and Class Members' communications and video viewing information were routed,  are located in California.

15.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein

occurred in this District, Plaintiff resides in this District, and third-party wiretapper Snapchat resides in this District.

## FACTUAL ALLEGATIONS

**I.      Overview Of The Pixels**

     **A.      The Facebook Tracking Pixel**

16.      Facebook, owned by Meta, describes itself as a "real identity platform,"[1] meaning users are allowed only one account and must share "the name they go by in everyday life."[2] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[3]

17.      Meta sells advertising space by highlighting its ability to target users.[4] Meta can target users so effectively because it surveils user activity both on and off its sites.[5] This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[6] Meta compiles this information into a generalized dataset called "Core Audiences," which allows advertisers to reach precise audiences based on specified targeting types.[7]

18.      Advertisers can also build "Custom Audiences."[8] Custom Audiences enables advertisers to reach "people who have already shown interest in [their]

---

[1] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[3] FACEBOOK, SIGN UP, https://www.facebook.com.

[4] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[5] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[6] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[7] https://www.facebook.com/business/news/Core-Audiences.

[8] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

---

business, whether they're loyal customers or people who have used [their] app or visited [their] website."[9]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[10]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers or by utilizing Meta's "Business Tools."[11]

19.     As Meta puts it, the Business Tools "help website owners and publishers, app developers, and business partners, including advertisers and others, integrate with [Facebook], understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[12]  Put more succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their websites, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

20.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a

---

[9] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[11] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[12] FACEBOOK, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

---

CLASS ACTION COMPLAINT                                                          5

purchase.[13]  Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[14]  Advertisers can even create their own tracking parameters by building a "custom event."[15]

21.    One such Business Tool is the Facebook Pixel (the "Facebook Pixel"). Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites.  The Facebook Pixel "tracks the people and type of actions they take."[16] When a user accesses a website hosting the Facebook Pixel, Meta's software script surreptitiously directs the user's browser to contemporaneously send a separate message to Meta's servers.  This secret and contemporaneous transmission contains the original GET request sent to the host website, along with additional data that the Facebook Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  At relevant times, two sets of code were thus automatically run as part of the browser's attempt to load and read Defendant's Website—Defendant's own code and Facebook's embedded code.

22.    Each time Defendant sent this activity data, it also disclosed a patient's personally identifiable information, including their Facebook ID ("FID").  An FID is

---

[13] *See* FACEBOOK, META FOR DEVELOPERS: META PIXEL, ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 ; FACEBOOK, META FOR DEVELOPERS: MARKETING API - APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[14] FACEBOOK, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[15] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 ; *see also* FACEBOOK, META FOR DEVELOPERS: MARKETING API – APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[16] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

---

CLASS ACTION COMPLAINT                                                                6

a unique and persistent identifier that Facebook assigns to each user. With it, any ordinary person can look up the user's Facebook profile and name. Notably, while Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID. Meta admits as much on its website. Indeed, ordinary persons who come into possession of the FID can connect to any Facebook profile.

23. A user who accessed Defendant's Website while logged into Facebook transmitted what is known as a "c_user cookie" to Facebook, which contained that user's unencrypted Facebook ID.

24. What is more, when a user checks out on the Website, Meta is sent the email address used to check out. The email address is encrypted by way of a process known as SHA256, which is a way to "hash" written words in a series of random numbers.

25. The Meta Pixel is designed to collect information about website visitors that can be matched to an individual's Facebook profile for the purpose of sending targeted advertising to that user. Though the "hashing" would prevent a party that is not Meta from obtaining the subscriber's email address, Meta, as the recipient of the data and the entity that creates the hash, can decrypt the hashed email addresses it receives and match it to the profile of Facebook users.

26. When the Facebook Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, the Facebook Pixel involves Meta, a separate and distinct third-party entity from the parties in the conversation, using the Facebook Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because Meta itself is collecting the content of any conversation. That information is then analyzed by Meta before being provided to any entity that was a party to the conversation (like Defendant).

27.     Once Meta intercepts website communications, it has the capability to use such information for its own purposes.  In 2021, Meta generated over $117 billion in revenue.[17]  With respect to the apps offered by Meta, substantially all of Meta's revenue is generated by selling advertising space.[18] Meta sells advertising space by highlighting its ability to target users by including them in the Core Audiences and Custom Audiences offered to its clients.[19]

28.     In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that Meta can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing Meta to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new Meta Business Tools products and services, or improve pre-existing Meta Business Tools products and services.

29.     One of Meta's partners is Vshred.  The Facebook Pixel is employed on the Website in the manner described throughout this Complaint.

### B.     The TikTok Pixel

30.      TikTok offers a SaaS called "TikTok Pixel," which "helps businesses track the performance of their ads" by sending information from the business's website to TikTok, who then uses that information to optimize ad campaigns on TikTok and across the internet.[20]

---

[17] FACEBOOK, META ANNUAL REPORT 2021, https://s21.q4cdn.com/399680738/files/doc_financials/annual_reports/2023/2021-Annual-Report.pdf at 51.

[18] *Id.* at 63.

[19] FACEBOOK, WHY ADVERTISE ON FACEBOOK, INSTAGRAM AND OTHER META TECHNOLOGIES, https://www.facebook.com/business/help/205029060038706.

[20] "TikTok Pixel 101: What It Is & How to Use It," https://popupsmart.com/blog/tiktok-pixel (Last accessed December 27, 2023).

---

31.     The TikTok pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

32.     The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads. By employing TikTok to collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

33.     In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information about what the user clicked on—such as the specific URL address visited by the user— or text entered into the webpage), a timestamp for the event, and the visitor's IP address.[21] That information is sent automatically to TikTok.

34.     The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

35.     Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

36.     On each Quiz page and checkout page on Defendant's Website (where the TikTok Pixel is installed), TikTok collects the URL value of the page visited (which contains the relevant part of the Quiz question), an identification code TikTok uses to track the user, and the visitor's browser type and operating system.

37.     When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the

---

[21] "About TikTok Pixel," https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2 (Last accessed December 27, 2023).

conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because TikTok itself is collecting the content of any conversation. That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant).

38. Once TikTok intercepts website communications, it has the capability to use such information for its own purposes. TikTok's Commercial Terms of Service grant TikTok "a non-exclusive, royalty-free, worldwide, transferable, sublicensable license to access, use, host, cache, store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[22]

39. In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

40. One of TikTok's partners is Vshred. The TikTok Pixel is employed on the Website in the manner described throughout this Complaint.

**C.     The Snap Pixel**

41. Snapchat offers a SaaS called the "Snap Pixel," which "helps advertisers measure results, optimize targeting, and build audiences for their ad campaigns."[23]

---

[22] "TikTok For Business Commercial Terms Of Service" https://ads.tiktok.com/i18n/official/policy/commercial-terms-of-service (Last accessed January 17, 2024).

[23] "Power Performance With The Snap Pixel" https://forbusiness.snapchat.com/advertising/snap-

42.     The Snap Pixel can be plugged into any website, as the pixel is "a piece of JavaScript code that's either installed on [a] website or integrated with an e-commerce store."[24]

43.     The Snap Pixel is part of a line of prebuilt software tools under Snapchat's "Business" product line.  By employing Snapchat to collect user information through the Snap Pixel, websites that procure Snapchat's services can use the information to deliver personalized advertisements, increasing revenue for the websites.

44.     When users interact with a webpage with the Snap Pixel installed, the Snap Pixel "tracks a variety of actions on [a] website, such as page views [*i.e.*, the URLs of webpages visited by users], add-to-cart actions, purchases, and sign-ups," as well as other "events," such as answering the Quiz questions.[25]  The information is sent automatically to Snapchat.

45.     The Snapchat advertising business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Snap Pixel.

46.     Thus, through websites that procure Snapchat's services, Snapchat directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

47.     When the Snap Pixel is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the Snap Pixel involves Snapchat, a separate and distinct third-party entity from the parties in the

---

pixel?_sid=PAID&utm_campaign=US_G_Search_Brand_MKAG-snapchatads&utm_content=whysnapads2&utm_medium=PAIDB2B&utm_source=GoogleSEM&utm_term=US&gclid=CjwKCAiAqNSsBhAvEiwAn_tmxW7cadFAgs3TBhgkWKuamlXzGBYv7RtoECeVCmIQmrEvZDHETtxD_hoCZSQQAvD_BwE (Last accessed January 4, 2024).

[24] *Id*.

[25] *Id*.

---

CLASS ACTION COMPLAINT                                                                                          11

conversation, using the Snap Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Snapchat itself is collecting the content of any conversation.  That information is then analyzed by Snapchat before being provided to any entity that was a party to the conversation (like Defendant).

48.     One of Snapchat's Partners is Vshred.  The Snap Pixel is employed on the Website in the manner described throughout this Complaint.

### D.     Datadog Real User Monitoring

49.     Datadog operates a SaaS called "Real User Monitoring" ("RUM"), which provides marketing and analytics to websites.[26]

50.     When installed on a website, RUM "[a]utomatically collect[s]…every…action during a user's session."[27]  RUM does this by collecting user "attributes like user ID, email, and name" and "actions such as checkout button click, tap, and more" in order to create "custom metrics that are specific to [a] business and correlate them with real-time product analytics."[28]

51.     RUM can operate as a stand-alone pixel on a website and collect the information described above and transfer it to Datadog in real time.

52.     RUM is equipped with an additional feature, also installed on the Website, called "Session Replay," which purports to help businesses improve their website design and customer experience.

53.     Session Replay creates a "video-like reproduction of the entire user journey" from the moment a user lands on the webpage.[29]

---

[26] Real User Monitoring https://www.datadoghq.com/product/real-user-monitoring/ (Last accessed March 30, 2024).

[27] *Id*.

[28] *Id*.

[29] Use Datadog Session Replay to view real-time user journeys, https://www.datadoghq.com/blog/session-replay-datadog/ (Last accessed April 2, 2024).

---

CLASS ACTION COMPLAINT                                                     12

54.     The RUM Session Replay relies on recording every second of a user's interactions with a website, allowing Datadog to "view exactly how your users interact with [a] website."[30]  This data is then analyzed and used to make a video that is an exact replica of each user interacting with the website.

55.     Technology like the RUM Session Replay feature is not only highly intrusive, but dangerous.  A 2017 study by Princeton University found that session recording technologies were collecting sensitive user information such as passwords and credit card numbers.  The research notes that this wasn't simply the result of a bug, but rather insecure practices.  Thus, session recording technologies such as Datadog's can leave users vulnerable to data leaks and the harm resulting therefrom.

56.     Datadog's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with RUM.

57.     Thus, through websites that employ Datadog's services, Datadog directly receives the recording of each website visit, including electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

58.     When RUM is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, it involves Datadog, a separate and distinct third-party entity from the parties in the conversation, using the RUM Session Replay to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Datadog itself is collecting the content of any conversation.  That information is then analyzed by Datadog before being provided to any entity that was a party to the conversation (like Defendant).

---

[30] *Id.*

59.     Once Datadog intercepts the Website communications, it has the ability to use such information for its own purposes.  Datadog's service agreement with customers like Defendant gives Datadog license to use customer data including "without limitation to develop and improve Datadog products and services and to create and distribute insights, reports and other materials."[31]

60.     Datadog's SaaS services are based on its ability to collect and analyze consumer's web behavior and deliver that data to present and future customers, who use that data for targeted advertising and product optimization.

61.     Information from websites, like Defendant's Website, is central to Datadog's ability to successfully market their advertising capabilities to future clients.

62.     In sum, Datadog has the capability to use website communications to (i) improve its own products and services; (ii) develop new products and services; and (iii) analyze website visitors' communications to assist with data analytics and targeted advertising.

63.     One of Datadog's partners is Vshred.  RUM is employed on the Website in the manner described throughout this Complaint.

### E.     The X Pixel

64.     X, formerly known as Twitter, is a popular social media platform described as a way to "join the public conversation."[32]  X describes its accounts as a user's "passport to what's happening in the world and what people are talking about right now" from "breaking news and what's popular … if a topic is worth talking about, you'll find it on X."[33]  In fact, the X platform is widely used by X

---

[31] Master Subscription Agreement https://www.datadoghq.com/legal/msa/#access-and-use (Last accessed March 30, 2024).

[32] X HELP CENTER, *Signing up with X*, *https*://help.twitter.com/en/using-x/create-x-account#:~:text=You%20can%20sign%20up%20for,email%20address%20or%20phone%20number.

[33] *Id.*

---

CLASS ACTION COMPLAINT                                                                        14

accountholders to access news[34] and users often follow X accounts for some of the most prominent politicians, such as President Biden.[35]  As such, X users value knowing that accounts on X are authentic and are held by the people who they claim to be.  X has implemented policies to halt misappropriation/deceit in account ownership.[36]

65.    X generates revenue by offering advertising services to businesses[37] such as selling advertising space on its platform.[38]  X highlights its ability to "reach the right people at the right time" via its X targeting tools.[39]  X can target users effectively because it surveils both a "person's on-platform and off-platform behavior … to determine if they are likely to engage with an ad" via X's Optimized Targeting.[40]

66.    Through its Custom Audiences features, X also allows its advertising customers to "create specific user groups that can be used for retargeting, exclusion, and/or expansion" of advertisements.[41]  Custom Audiences are generated through different avenues such as the advertiser uploading their customer data to be matched with X profiles, and as is relevant to this case, through "Website Activity Custom

---

[34] PEW RESEARCH CENTER, *News on Twitter: Consumed by Most Users and Trusted by Many*, (Nov. 15, 2021), https://www.pewresearch.org/journalism/2021/11/15/news-on-twitter-consumed-by-most-users-and-trusted-by-many/ Stating that 69% of users got news on the site.

[35] X, President Biden, https://twitter.com/POTUS (having 34.2 million X followers).

[36] X HELP CENTER, *Misleading and deceptive identities policy*, https://help.twitter.com/en/rules-and-policies/x-impersonation-and-deceptive-identities-policy.

[37] X BUSINESS, https://business.twitter.com/en/advertising.html?ref=gl-tw-tw-twitter-advertise.

[38] X BUSINESS, *X Ads targeting*, https://business.x.com/en/advertising/targeting.html.

[39] *Id.*

[40] X BUSINESS, *Optimized Targeting*, https://business.twitter.com/en/help/campaign-setup/campaign-targeting/optimized-targeting.html.

[41] X BUSINESS, *Intro to Custom Audiences*, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences.html.

---

CLASS ACTION COMPLAINT                                                          15

Audiences" "[p]owered by the X Pixel" that measures "people who have visited or taken a specific action on [the advertiser's] website" that are then matched with X user profiles.[42]

67.     Website Activity Custom Audience "uses X's Website Tag to collect people who have visited or taken certain actions on [the advertiser's] website.  To use Website Activity Audiences, [the advertiser] must have [X's] conversion tracking pixel installed on [its] website."[43]  X's Website Tag is a "snippet of code" that advertisers "place on pages of [their ] website."[44]  Once the code is embedded on the website, the "website tag begins to collect the cookie IDs of visitors and matches them to X users."[45]  One such cookie is the twid cookie that is used for authenticating X users.[46]  This allows X to target ad campaigns to those X users that recently visited the advertiser's website.[47]  Once X collects a website visitor's cookie ID and matches that person with their X account, the user will remain in the advertiser's custom audience for 90 days.[48]

68.     The X Pixel is "made up of two parts," the base code and the event code.[49]  The base code tracks the website's visits and "initializes the pixel so that [advertisers] can track additional events via event code or create audiences."[50]  The

---

[42] *Id.*

[43] X BUSINESS, *Website Activity Custom Audiences*, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity.html.

[44] *Id.*

[45] *Id.*

[46] X HELP CENTER, *How cookies are used on X*, https://help.twitter.com/en/rules-and-policies/x-cookies.

[47] *Supra* note 48.

[48] *Id.*

[49] X BUSINESS, *Conversion tracking for websites*, https://business.twitter.com/en/help/campaign-measurement-and-analytics/conversion-tracking-for-websites.html.

[50] *Id.*

---

CLASS ACTION COMPLAINT                                                                 16

event code allows advertisers to track "individual actions on [their] websites, like Purchases.[51]"  Businesses control what individual actions the X Pixel will collect on that businesses' website.[52]

69.     When the X Pixel is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the X Pixel involves X, a separate and distinct third-party entity from the parties in the conversation, using the X Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because X itself is collecting the content of any conversation.  That information is then analyzed by X before being provided to any entity that was a party to the conversation (like Defendant).

70.     Once X intercepts the Website communications, it has the capability to use such information for its own purposes.  For example, X can utilize Conversion Data—data gathered via the X Pixel used to generate Custom audiences—to "optimize [X's] ad targeting and ad delivery models; and [] develop, maintain and improve [its] products and systems.[53]

71.     X's range of SaaS services is based on X's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

72.     Information from websites, like Defendant's Website, is central to X's ability to successfully market its advertising capabilities to future clients.

---

[51] *Id.*

[52] *Id.*

[53] X, MASTER SERVICES AGREEMENT, https://legal.twitter.com/ads-terms/us.html.

---

CLASS ACTION COMPLAINT                                                        17

73.     One of X's partners is Vshred.  The Google Analytics Pixel is employed on the Website in the manner described throughout this Complaint.

### F.     Google Analytics

74.     Google offers a range of advertising SaaS's, one of which is called "Google Analytics."

75.     "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights" for businesses.[54]  This is made possible by the Google Analytics Pixel, a piece of code installed on a website that collects information on how website users interact with a business's website, such as "how many users bought an item … by tracking whether they made it to the purchase-confirmation page."[55]

76.     Google advertises this service can "[m]onitor activity on your site as it happens."[56]

77.     Google's business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Google Analytics Pixel.

78.     Thus, through websites that employ Google's services, Google directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

79.     On each Quiz page and checkout page on Defendant's Website (where the Google Analytics is installed), Google Analytics collects the visitor's individual response to the quiz question, an identifier used to track the visitor's activity across

---

[54] "How Google Analytics Works" https://support.google.com/analytics/answer/12159447?hl=en&ref_topic=14089939&sjid=2827624563183915220-NC. (Last accessed January 4, 2024).

[55] *Id*.

[56] "The Finer Points" https://marketingplatform.google.com/about/analytics/features/. (Last accessed January 4, 2024).

---

CLASS ACTION COMPLAINT                                                                 18

websites, the language spoken on the site, and the visitor's browser, operating system, and Wi-Fi provider.

80.   When the Google Analytics Pixel is used on an entry to a website, it is not like a tape recorder or a "tool" used by one party to record the other.  Instead, the Google Analytics Pixel involves Google, a separate and distinct third-party entity from the parties in the conversation, using the Google Analytics Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party.  This is so because Google itself is collecting the content of any conversation. That information is then analyzed by Google before being provided to any entity that was a party to the conversation (like Defendant).

81.   Once Google intercepts the Website communications, it has the capability to use such information for its own purposes. "Google uses the information shared by sites and apps to deliver [] services, maintain and improve them, develop new services, measure the effectiveness of advertising, protect against fraud and abuse, and personalize content and ads you see on Google and on [] partners' sites and apps."[57]

82.   Google's range of SaaS services is based on Google's ability to collect and analyze information about consumers' web behavior and deliver targeted advertising to select consumers based on their web habits.  This involves collecting visitor information from thousands of websites and then analyzing that information in order to deliver targeted advertising and group web users so that they can be targeted for products and categories they are interested in.

83.   Information from websites, like Defendant's Website, is central to Google's ability to successfully market their advertising capabilities to future clients.

84.   In sum, Google has the capability to use website communications to (i) improve its own products and services; (ii) develop new Google for Business and

---

[57] "Google Privacy and Terms," https://policies.google.com/technologies/partner-sites (Last accessed January 17, 2024).

Google Analytics products and services; and (iii) analyze website visitors' communications to assist with and data analytics and targeted advertising.

85.     One of Google's partners is Vshred.  The Google Analytics Pixel is employed on the Website in the manner described throughout this Complaint.

**II.     Defendant Installed The Pixels On The Quiz**

86.     Defendant's Quiz and following checkout screens are the part of the Website at issue in this action.

87.     The Quiz is portrayed to Website visitors as a way to personalize recommendations for Vshred's products and workout programs by asking first-time visitors to the Website about their age, height, weight, gender, weight loss goals, body image, and views on weight loss and weight loss programs.

88.     Defendant employed the services of the Third Parties and their Pixels on each page of the Quiz to track users' responses to the questions and send those responses to the Third Parties so the Third Parties can analyze the information and enable Defendant to target users with ads based on those answers.

89.     The images below show the series of Quiz questions given to Website visitors when they navigate to vshred.com.  Each of the Pixels are installed on each page of the Quiz, collecting information from users who answer the Quiz questions.

90.     When users first arrive on the Website, they are immediately prompted to begin the Quiz, which first asks the users' sex.  Users respond by clicking one of the two buttons.

**Figure 1:**



91.    The next Quiz question asks the user's age range.  Users respond by clicking one of the buttons.

**Figure 2:**



92.    The next Quiz question asks the user's height.  Users respond by dragging the dot to their corresponding height in feet and inches.

1

**Figure 3:**

2



11   93.    The next Quiz question asks the user's weight.  Users respond by

12   dragging the dot to their corresponding weight.

13   **Figure 4:**



23   94.    The next Quiz question asks the user to describe their activity level.

24   Users respond by clicking one of the buttons.

**Figure 5:**



95.     The final Quiz question asks the user to describe issues they have with fitness or weight loss.  Users respond by clicking one of the buttons.

**Figure 6:**



96.     After the Quiz is completed, the user is directed to a page featuring a video from Vshred founder Vince Sant and giving the user options to purchase various Vshred products.  Importantly, the results of the survey-the user's gender, height, weight, and activity level (*i.e.* users' confidential communications with

---

CLASS ACTION COMPLAINT                                                                    23

Vshred) are included in the URL of this page.  This means *any* tracker installed on the page, even those only receiving a "page view" event, intercepts Website user's responses to the Quiz questions.

**Figure 7:**



https://vshred.com/sp/survey/results-male-cb-bt-f3?activity=moderate&age=25&centimeters=90&condition=maleHardGainer&gender=male&inches=69&kilograms=0&macro_goal=build-muscle&segment=3&units=imperial&weight=235

97.    After the users select the Vshred products to purchase, they are directed to a checkout page where they enter their name, email address, and payment information.  For a second time, the users' answers to the Quiz questions are included in the page URL, providing users' confidential communications to any tracker getting a "checkout" event.

**Figure 8:**



98.     Further, the Third Parties receive a hashed version of the users' email address upon checkout.  Below is the GET request from the Facebook Tracking Pixel on the Vshred checkout page.  The URL contains the Quiz answers and Meta receives a hashed version of the email address (identified by the udff[em] marking).

1    **Figure 9:**

id    1140110382743358
ev    SubscribedButtonClick
dl    https://le.vshred.com/checkout-vs/clean-bulk-program-bt-f3?funnel=survey-lp-results-funnel-vsu-special-offer-bt-f3
rl    https://le.vshred.com/sp/survey/results-male-cb-bt-f3?t=&condition=maleHardGainer&segment=3&gender=male&age=55&activity=moderate&macro_goal=build-muscle&units=imperial&inches=76&centimeters=90&weight=160&kilograms=0
if    false
ts    1709569639807
cd[buttonFeatures]   {"classList":"next-step button-two","destination":"https://le.vshred.com/checkout-vs/clean-bulk-program-bt-f3?funnel=survey-lp-results-funnel-vsu-special-offer-bt-f3#","id":"","imageUrl":"linear-gradient(rgb(64, 180, 230) 0%, rgb(6, 98, 186) 100%)","innerText":"NEXT STEP","numChildButtons":0,"tag":"span","type":null}
cd[buttonText]    NEXT STEP
cd[formFeatures]   [{"id":"","name":"","tag":"input","placeholder":"Enter Your Name","inputType":"text"},{"id":"","name":"","tag":"input","placeholder":"Enter Your Email","inputType":"email"},{"id":"","name":"","tag":"input","placeholder":"Phone Number","inputType":"tel"}, {"id":"checkbox","name":"special_offer","tag":"input","inputType":"checkbox"},{"id":"submit-order","name":"","tag":"button"}]
cd[pageFeatures]   {"title":"V Shred - My Account "}
cd[parameters]   []
sw    1920
sh    1080
udff[fn]   fc5a299cd6cd644f40bdcc8f7ae00e89a4ae4fbc44031c4bc27e54dd4bcb9773
udff[ln]   c1d35cc3471fe509203d65b3e7a53fc82337ac9ae2c797b83662lf706fe37df8
udff[em]   2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb
udff[ph]   b83ba9ccf537072fc493add36c6dbc76d92984941 7ab6c0d7cc3bec1c177030d

99.    At no time are Website visitors asked whether they agree to any type of privacy policy or given any sort of alleged notice that their information and communications are being sent to any third party.

**III.    Defendant Installed The Pixels On Its Video Pages**

100.    Several pages on Defendant's Website, including on the home page, in the checkout flow, and on pages containing exercise videos for purchasers of specific packages of products, allow website visitors to click a link to watch different videos made to address various personal fitness topics.

101.    Defendant employed the services of the Third Parties and their Pixels to track users' video viewing information and send that information to the Third Parties so the Third Parties can analyze the information and enable Defendant to target users with ads.

102.   The images below show an example of a video on Defendant's Website where the video URL and c_user cookie, personally identifying information, were sent to Meta via the Facebook Tracking Pixel.

**Figure 10:**



103.   All the Pixels that employ "pageview" technology or session replay technology received the URL for each video, which allow an ordinary person to determine which video was watched by each website visitor.

104. The VPPA only allows a video tape service provider to disclose PII of a consumer to a third party "with the informed, written consent (including through an electronic means using the Internet) of the consumer that—(i) is in a form distinct and separate from any form setting forth other legal or financial obligations to the consumer." 18 U.S.C. § 2710(B)(i). The video tape service provider must also "provide[] and opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." 18 U.S.C. § 2710(B)(iii).

105. Defendant failed to receive the requisite consent under VPPA because it did not obtain informed, written consent, in a separate and distinct form.

## IV. Plaintiff's Experience

106. In or about March 2024, Plaintiff visited Defendant's Website while in California and answered the questions for the Quiz and viewed videos on the Website.

107. During those visits, Plaintiff entered information into Defendant's Quiz, including all of the various fields and questions pictured above (*e.g.*, weight, height, age, gender, body image, and fitness level).

108. As Plaintiff moved through the Quiz (*i.e.*, in real time), the Third Parties—as aided, agreed with, employed, and procured by Defendant—wiretapped Plaintiff's answers to the Quiz questions (*i.e.*, the contents of Plaintiff's electronic communications with the Website).

109. The Third Parties also captured the date and time of the visits, the duration of the visits, Plaintiff's IP addresses, their location at the time of the visits, their browser types, and the operating system on their devices.

110. The Third Parties' recording of electronic communications begins the moment a user accesses or interacts with the Quiz on Defendant's Website, prior to a user consenting to any sort of privacy policy or the pixels generally. Nor are users

told, prior to being wiretapped, that their electronic communications are being simultaneously directed to a Third Party, rather than only to Vshred.

111.   Users, including Plaintiff, are thus not on notice of any wiretapping when they begin answering questions on Defendant's Website, nor do they provide prior consent to the same.

112.   Plaintiff was in California when he accessed Defendant's website through an internet browser and entered personal information into Defendant's Quiz. Upon having the browser access the website in California, the Pixels each instructed the browser in California to send the electronic communications directly to the respective Third Parties' servers.

113.   The Third Parties had access to Plaintiff's and Class Members' answers to Quiz questions and other personal information entered on Defendant's Website because each company contracts with Vshred to hide the Pixels in the Website.

114.   When Plaintiff watched videos on the Website, Defendant disclosed his event data, which recorded and disclosed the video's URL to the Third Parties. Defendants also disclosed identifiers for Plaintiff to the Third Parties in the manner described above.

**V.     Defendant Aided Agreed With, Employed, Procured, Or Otherwise Enabled The third parties' Wiretapping Of Plaintiff's Electronic Communications And Disclosure Of Video Information For Advertising, Marketing, And Data Analytics Purposes**

    **A.     Defendant Disclosed Users' Information To Meta For the Purpose Of Marketing, Advertising, And Analytics**

115.   As described above, the Facebook Pixel collects information from visitors' interactions with Defendant's Website.

116.   The purpose of this invasion of privacy is straightforward: Meta collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

117.   This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

118.   In addition to helping companies like Defendant make better use of their own customer information, Meta aggregates that information with the information collected from all sites containing the Facebook Pixel to track users across multiple websites and platforms, which increases the value of Meta's advertising services when they are offered to other companies.

119.   Thus, the agreement for Defendant to aid in Meta's wiretapping of Plaintiff and Class Members' personal responses to the Quiz questions is done for the purpose of improperly increasing the advertising efficiency and, by extension, profits of both parties.

### B.   Defendant Disclosed Users' Information To TikTok For the Purpose Of Marketing, Advertising, And Analytics

120.   As described above, the TikTok Pixel collects information from visitors' interactions with Defendant's Website.

121.   The purpose of this invasion of privacy is straightforward: TikTok collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

122.   This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

123.   In addition to helping companies like Defendant make better use of their own customer information, TikTok aggregates that information with the information collected from all sites containing the TikTok Pixel to track users across multiple websites and platforms, which increases the value of TikTok's advertising services when they are offered to other companies.

124.   Thus, the agreement for Defendant to aid in TikTok's wiretapping of Plaintiff and Class Members' personal responses to the Quiz questions is done for the purpose of improperly increasing the advertising efficiency and, by extension, profits of both parties.

**C.      Defendant Disclosed Users' Information To Snapchat For the Purpose Of Marketing, Advertising, And Analytics**

125.   As described above, the Snap Pixel collects information from visitors' interactions with Defendant's Website.

126.   The purpose of this invasion of privacy is straightforward: Snapchat collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

127.   This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

128.   In addition to helping companies like Defendant make better use of their own customer information, Snapchat aggregates that information with the information collected from all sites containing the Snap Pixel to track users across multiple websites and platforms, which increases the value of Snapchat's advertising services when they are offered to other companies.

129.   Thus, the agreement for Defendant to aid in Snapchat's wiretapping of Plaintiff and Class Members' personal responses to the Quiz questions is done for the purpose of improperly increasing the advertising efficiency and, by extension, profits of both parties.

**D.      Defendant Disclosed Users' Information To Datadog For the Purpose Of Marketing, Advertising, And Analytics**

130.   As described above, the Datadog RUM collects information from visitors' interactions with Defendant's Website.

131.   The purpose of this invasion of privacy is straightforward: Datadog collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and performance data and providing session information used for targeting ads for specific individuals.

132.   This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

133.   In addition to helping companies like Defendant make better use of their own customer information, Datadog aggregates that information with the information collected from all sites containing Datadog RUM to track users across multiple websites and platforms, which increases the value of Datadog's services when they are offered to other companies.

134.   Thus, the agreement for Defendant to aid in Meta's wiretapping of Plaintiff and Class Members' personal responses to the Quiz questions is done for the purpose of improperly increasing the website and advertising efficiency and, by extension, profits of both parties.

### E.    Defendant Disclosed Users' Information To X For the Purpose Of Marketing, Advertising, And Analytics

135.   As described above, the X Pixel collects information from visitors' interactions with Defendant's Website.

136.   The purpose of this invasion of privacy is straightforward: X collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

137.   This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

138.   In addition to helping companies like Defendant make better use of their own customer information, X aggregates that information with the information collected from all sites containing the X Pixel to track users across multiple websites and platforms, which increases the value of X's advertising services when they are offered to other companies.

139.   Thus, the agreement for Defendant to aid in X's wiretapping of Plaintiff and Class Members' personal responses to the Quiz questions is done for the purpose of improperly increasing the advertising efficiency and, by extension, profits of both parties.

### F.   Defendant Disclosed Users' Information To Google For the Purpose Of Marketing, Advertising, And Analytics

140.   As described above, the Google Analytics Pixel collects information from visitors' interactions with Defendant's Website.

141.   The purpose of this invasion of privacy is straightforward: Google collects information from Defendant's website and sends back an analysis of that information, identifying website traffic and ad performance and targeting ads for specific individuals.

142.   This is valuable to Defendant because it improves the effectiveness of Defendant's advertisements, allows for the targeting of users, and provides performance information for ad campaigns.

143.   In addition to helping companies like Defendant make better use of their own customer information, Google aggregates that information with the information collected from all sites containing the Google Analytics Pixel to track users across multiple websites and platforms, which increases the value of Google's advertising services when they are offered to other companies.

144.   Thus, the agreement for Defendant to aid in Google's wiretapping of Plaintiff and Class Members' personal responses to the Quiz questions is done for

the purpose of improperly increasing the advertising efficiency and, by extension, profits of both parties.

145.   In sum, The Third Parties each generate their own revenue by information mining internet activity and using that information for targeted advertising or to improve their own products.  They each used the information collected by the Pixels to analyze marketing campaigns, conduct targeted advertising, and ultimately boost their own advertising revenue.

146.   None of the companies recorded the information for the sole benefit of Defendant; instead, each of them used (or had the capability to use) the information obtained from the Pixels for their own benefit.

## CLASS ALLEGATIONS

147.   Plaintiff seeks to represent a class of all persons in the United States who watched a video on Defendant's website during the statute of limitations period (the "Class").

148.   Plaintiff also seeks to represent a subclass of all California residents who entered information into the Quiz or the checkout pages on vshred.com while in California during the statute of limitations period (the "California Subclass").

149.   Excluded from the Class are: (i) Defendant and its officers, directors, employees, principals, affiliated entities, controlling entities, and other affiliates; (ii) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (iii) the Judge(s) assigned to this case and any members of their immediate families.

150.   Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of members of the Class and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Class may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

---

CLASS ACTION COMPLAINT                                                           34

151.   There is a well-defined community of interest in the common questions of law and fact affecting Class members.  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members of the Class.  Common legal and factual questions include, but are not limited to, whether Defendant has violated the CIPA and whether members of the Class are entitled to actual and/or statutory damages for the aforementioned violations.

152.   The claims of the named Plaintiff are typical of the claims of the Class because the Plaintiff, like all other class members, visited Defendant's website and had their electronic communications intercepted and disclosed to The Third Parties through the use of the Pixels.

153.   Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

154.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure

that all claims and claimants are before this Court for consistent adjudication of the liability issues.

155.   Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## <u>COUNT I</u>
### Violation of the California Invasion of Privacy Act
### Cal. Penal Code § 631(a)

156.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

157.   Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

158.   CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

159.   CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier*, 2022 WL 1744107, at *1 ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

160.   The Pixels are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

161.   The Third Parties are each a "separate legal entity that offer[] [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, each Third Party had the capability to use the wiretapped information for its own purposes. Accordingly, the Third Parties were each a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

162.   At all relevant times, by using the Pixels, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized

manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and California Subclass Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

163.   At all relevant times, the Third Parties used or attempted to use the communications intercepted by their Pixels to improve their products and services, track and advertise to internet users across websites, and generate revenue for themselves and their clients.

164.   At all relevant times, Defendant aided, agreed with, employed, or otherwise enabled the Third Parties to wiretap consumers to the Website using the Pixels and to accomplish the wrongful conduct at issue here.

165.   Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass Members' electronic communications.  Nor did Plaintiff and California Subclass Members provide their prior consent to Defendant aiding, agreeing with, employing, or otherwise enabling the Third Parties' conduct.

166.   The wiretapping of Plaintiff and California Subclass Members occurred in California, where Plaintiff and California Subclass Members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff's and California Subclass Members' electronic communications to each Third Parties' respective servers.

167.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II
## Violation of the Video Privacy Protection Act
## 18 U.S.C. § 2710, *et seq.*

168.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

169.   Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class against Defendant.

170.   Defendant is a "video tape service provider" because it creates, hosts, and delivers videos on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  In particular, Defendant provides a library of audiovisual material.

171.   Plaintiff and members of the Nationwide Class are "consumers" because they have paid to watch videos on Defendant's website.  18 U.S.C. § 2710(a)(1).

172.   Defendant disclosed to the Third Parties Plaintiff's and the Nationwide Class Members' PII.  Defendants utilized the Pixels to compel Plaintiff's and Class Members' web browser to transfer his identifying information, like the Facebook ID and hashed email address, along with Plaintiff's and Class Members' event data, like the title of the videos viewed.

173.   Plaintiff and the Nationwide Class viewed videos on Defendant's website.

174.   Defendant knowingly disclosed Plaintiff's PII because it knowingly and intentionally installed the Pixels on their website and controlled its functionally on that site.

175.   Plaintiff and Nationwide Class did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

---

CLASS ACTION COMPLAINT

176.   Nor were Defendant's disclosures made in the "ordinary course of business," as the term is defined by the VPPA.  In particular, Defendant's disclosures to the Third Parties were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership."  18 U.S.C. § 2710(a)(2).

177.   On behalf of himself and the members of the Nationwide Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the United States Class by requiring Defendants to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)     For an order certifying the Class under Rule 23, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c)     For judgment in favor of Plaintiff and the Class on all counts asserted herein;

(d)     For compensatory, punitive, and statutory damages in amounts to be determined by the Court and/or jury;

(e)     For prejudgment interest on all amounts awarded; and

(f)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY TRIAL DEMANDED**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all claims so triable.

Dated:  June 11, 2024          Respectfully submitted,

**BURSOR & FISHER, P.A**.

By:    /s/ *L. Timothy Fisher*   
                      L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
             jwilner@bursor.com

*Attorneys for Plaintiff*